**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Crim. No. 22-cr-257 (CJN)** |
| | : | |
| **MILOMIR DESNICA,** | : | |
| | : | |
| **Defendant.** | : | |

### MEMORNDUM IN SUPPORT OF DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files this memorandum in support of its request that the defendant be held without bond.  As explained below, the defendant should be detained pursuant to 18 U.S.C. § 3142(f)(1)(C) (Controlled Substances Act offense) and 18 U.S.C. § 3142(f)(2)(A) (Risk of Flight).

### Procedural History

The defendant, a Serbian national, was charged by indictment on July 26, 2022, with one count of Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii) and Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §1956(h).  Based on information that he was in Austria, the defendant was arrested in Vienna on November 2, 2022, on a provisional arrest warrant Austrian authorities had issued pursuant to the indictment.  The defendant contested his extradition but was ultimately found extraditable by Austrian courts and was extradited to the United States on June 23, 2023.  He is expected to have his initial appearance in the United States District Court for the District of Columbia on June 26, 2023.

## Relevant Legal Authorities

This Court may detain a defendant upon motion of the government in a case that, as here, involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act…."  18 U.S.C. § 3142(f)(1)(C).  Here, there is a rebuttable presumption of detention under 18 U.S.C. § 3142(e)(3)(A).  Accordingly, "[s]ubject to rebuttal by the person, *it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community* if the judicial officer finds that there is probable cause to believe that the person committed" the predicate offense.  Id.  The indictment, standing alone, constitutes probable cause that the person charged committed the offenses charged.  United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996).

The presumption is rebuttable and does not shift the ultimate burden of proof from the government's shoulders.  But it does create a burden of *production* on the defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court among others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight."  United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); United States v. Rueben, 974 F.2d. 580, 586 (5th Cir. 1992) (the mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . .  In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); United States v. Rodriguez, 950 F.2d 85, 88 (2nd Cir. 1991) ("Although the government

retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant . . . see also United States v. Jessup, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach") (internal citation omitted)); see also United States v. Ali, 793 F.Supp.2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

Relevant to that ultimate determination are the usual factors under 18 U.S.C. § 3142(g) – namely, (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's past conduct and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. See United States v. Zhang, ]51 F. 4th 141 (2d Cir. 2022) (holding that each factor is to be given equal weight); see also United States v. Blackson, 23-cr-25 (Doc. 18 at 17-20) (Howell, C.J.) (following Zhang and discussing contrary opinion from Ninth Circuit).

The Court may also detain a defendant upon motion of the government or the Court's own motion in a case that involves a "serious risk" that the defendant "will flee." 18 U.S.C. § 3142(f)(2)(A). Where "risk of flight" is the basis for detention, the presumption of detention does not apply, but the government must only prove that no conditions will reasonably assure the defendant's appearance or community safety by a preponderance of the evidence standard – not clear and convincing evidence. See United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996).

<u>**Argument**</u>

A. <u>**Nature and Circumstances of the Offenses Charged**</u>

   1. <u>**Monopoly Market**</u>

In late 2019, the FBI began investigating a darknet market known as Monopoly Market ("Monopoly"). Monopoly operated much like a conventional e-commerce website: users could browse goods for sale from Monopoly's home page which was organized by category. These categories included categories such as ecstasy, pharmaceuticals, and stimulants.



Monopoly Market Main Page as of 12/8/2021 @ 1.41.36 PM



Monopoly Market Main Page as of 12/8/2021 @ 1.41.39 PM

Monopoly was set up as a "hidden service" or "onion service" on the "dark web" also known as the "dark net." The dark web is a part of the World Wide Web accessible only through anonymity-enhancing platforms such as the Tor network, a special network of computers on the Internet designed to conceal users' true IP addresses. Monopoly required that all transactions be conducted in cryptocurrencies, including Bitcoin and Monero.

To operate as a vendor on Monopoly, vendors first had to complete an application. This application was reviewed by the Monopoly operator using the vendor name "Monopoly" on the Monopoly Market and accompanying Monopoly Forum and the moniker "u/MonopolyOfficial" on the darknet forum Dread. The application requested a variety of information from potential vendors, including descriptions of the items they intended to list, markets the vendors had previously sold on, PGP Public Keys associated with their current and previous vendor identities,

and how vendors wished to pay their commissions to the Monopoly operator.[1] The Monopoly operator also had to confirm the inventory of the prospective vendor, that is, the vendor actually had the drugs it was requesting to sell.  Usually, this was done by the vendor taking photographs of its drug stock. The Monopoly operator would typically then make comments on these applications such as requesting additional clarifying information, advising that the prospective vendor had been accepted, or denying the application. Denials would typically provide a reason for the denial and instructions on how to improve their chance of being accepted. These vendor applications were posted publicly on Dread and later the Monopoly Forum.

Unlike most other darknet markets, Monopoly operated with a post-payment commission system. The vendor received the full proceeds of sales completed on the market. At regular time intervals agreed upon in the vendor's application, the operator of Monopoly invoiced the vendor for the amount owed to the operator based on the sales completed during that timeframe at the agreed-upon rate.  The Monopoly operator typically took 5% of a vendor's sales.  In this fashion, Monopoly facilitated over $18 million in narcotics sales.

### 2.  Law Enforcement Action[2]

During its investigation, the FBI confirmed on numerous occasions that Monopoly was used to commit crimes in the United States. Specifically, undercover FBI employees in the District of Columbia as well as the Eastern District of Virginia purchased narcotics from the site and

---

[1] PGP or "Pretty Good Privacy" is software that allows for the encryption and decryption of text and files. GPG is an open-source implementation of PGP that is free. PGP/GPG encryption uses two "keys" referred to as the Public Key and the Private Key. A user's Public Key, as the name implies, is meant to be shared widely to allow people to encrypt messages to the user. The recipient then uses their private key to decrypt a message or file that was encrypted using their public key. In practice, this means that Private Keys are not widely shared to maintain their integrity and security, but that Public Keys must be made available to others to facilitate encrypted communication. As part of generating a Public Key and a Private Key, also referred to as a "Key Pair," users may, but are not required to, provide an e-mail address and/or name or moniker that may be incorporated into the header of the Public Key and subsequently visible when the public key is imported into PGP/GPG software.

[2] The government is providing a limited summary of its evidence against Desnica so that the Court can make its detention decision.   This memo does not attempt to summarize all of its evidence against the defendant.

received it successfully in these locations.  The controlled purchases totaled over 100 grams of methamphetamine.  The charts below detail the purchases and their corresponding lab results.

| Purchase | Received | Description | From | To | Weight |
|---|---|---|---|---|---|
| 2/8/2021 | 2/12/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | DC | VA | 14g |
| 2/18/2021 | 03/4/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | VA | VA | 14g |
| 3/8/2021 | 3/17/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | DC | DC | 14g |
| 4/20/2021 | 4/27/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | DC | DC | 28g |
| 5/7/2021 | 5/19/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | DC | DC | 28g |
| 5/25/2021 | 6/2/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | DC | DC | 28g |
| 9/17/2021 | 9/29/2021 | "Crystal Meth" | VA | DC | 3g |
| 11/3/2021 | 11/9/2021 | "Crystal Meth" | DC | VA | 10g |

| Purchased | Received | Description | Amount | Lab Amount (Pure) | Lab Result |
|---|---|---|---|---|---|
| 2/8/2021 | 2/12/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 14g | 13.20 g +/-.84 | Meth |
| 2/18/2021 | 03/4/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 14g | 13.52g +/-.83g | Meth |

| 3/8/2021 | 3/17/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 14g | 13.39g +/- .82g | Meth |
| 4/20/2021 | 4/27/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 28g | 27.91g +/- 1.69g | Meth |
| 5/7/2021 | 5/19/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 28g | 25.31g +/- 1.58g | Meth |
| 5/25/2021 | 6/2/2021 | "Good quality Crystal Meth Methamphetamine 14g-448g US/US Shipping" | 28g | 27.576g +/- 1.865g | Meth |
| 9/17/2021 | 9/29/2021 | "Crystal Meth" | 3g | 2.66g +/- 0.18g | Meth |
| 11/3/2021 | 11/9/2021 | "Crystal Meth" | 10g | 9.974g +/- .603g | Meth |

On or about December 28, 2021, a server hosting Monopoly was seized by a foreign law enforcement partner. Pursuant to a Mutual Legal Assistance Treaty (MLAT) request the FBI obtained a forensic image of this server which contained both the market database as well as the forum database. Technical examination of the image revealed several data tables of interest.

One data table was labeled "payments." This table listed details of the invoices sent to the vendors and the bitcoin or Monero address in which the vendor should transfer the funds to pay the operator of Monopoly for the monthly fee based on sales. The table also included invoice numbers, vendor IDs, amounts, whether the invoice was paid or not, and the date and time of the invoice. For invoices prior to October 22, 2021, the contents of the payment address field had been deleted, but the remaining information was intact.

The FBI subsequently analyzed numerous transactions to and from the addresses believed to be controlled by the operator of Monopoly. Based on a review of the transactions, it appeared that each month, since at least April 2020, the operator of Monopoly would liquidate the funds it

received in bitcoin from vendor payments by sending half of the proceeds to an address for storage, which remained unspent as of May 2022. The other half of the funds were sent to at least two cryptocurrency exchange services that did not collect user information.

### 3. Identification of the Defendant

The FBI identified two bitcoin deposits from MoonPay.io (MoonPay) into the wallet that also received the July 2020 Monopoly proceeds. On April 6, 2022, MoonPay provided records indicating the bitcoin deposited into the wallet was purchased by Desnica through an account registered with a Google account. Additional details indicate Desnica purchased the bitcoin using credit cards ending in 8077 and 0719. The account registered to Desnica was linked to Desnica's gmail address of fakkura@gmail.com.

Records provided by Google on April 21, 2022, revealed the fakkura@gmail.com account was created on April 20, 2015, and registered to an individual named Fakku with a recovery email of 0x0ffd@gmail.com.[3] A Google Pay account was also associated with the account having a billing name and address of Milomir Desnica, of Serbia. The Google Pay account listed a credit card ending in 0719, which is the last four digits of the credit card used to purchase bitcoin that was deposited directly into a wallet controlled by the operator of Monopoly.

Furthermore, Desnica used a Serbian IP address to access the fakkura@gmail account within minutes of the Monopoly operator using the same IP address to exchange cryptocurrency. Finally, Desnica engaged in online forums and social media accounts where he displayed a knowledge of coding, computer systems, narcotics, cryptocurrency, and spoke in fluent English.

---

[3] 0x0ffdg is hexadecimal code, commonly used by software developers as a human-readable way of expressing binary encoded information. In this particular case, 0x0ffd translates to the number 4093, a prime number. The use of hexadecimal code suggests the operator of the account is familiar with mathematics and/or software development. Prime numbers are also a key element of the public-key cryptography used by PGP/GPG.

Importantly, a search warrant of the fakkura@gmail.com account revealed that it contained seed phrases needed to access some of the Monopoly operator's bitcoin wallets.  (Seed phrases are twelve-word phrases that function as passwords for a bitcoin wallet so it is very unlikely that someone with the seed phrases got them without being associated with Monopoly's operator.)

Even apart from the presumption that applies in narcotics cases, this factor weighs in favor of detention.  The defendant is facing a mandatory-minimum sentence of 10 years and a maximum sentence of life.  The lengthy potential sentence provides strong incentive for the defendant to flee.  See United States v. Shulkin, 2019 WL 5867289 at *2 (S.D. Ohio) (denying defendant's bond motion when he was facing a maximum penalty of 20 years and facing a significant guideline sentence); United States v. Morris, 2015 WL 3752356 (S.D. Miss.) (denying bond motion in drug case when defendant's family resided in Thailand and defendant faced significant penalties if convicted).

### B.   Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.  The evidence against the defendant is very strong.  As noted above, he is directly tied to Monopoly Market by various social media, personal email accounts, and the seed phrases needed for Monopoly's bitcoin wallet.  This factor weighs in favor of detention.  See, e. g., United States v. Boustani, 356 F. Supp. 3d 246, 253 (E.D.N.Y. 2019) (noting that strong evidence of guilt in a case with a lengthy likely sentence provides strong incentive for a defendant to flee).

### C.   The Defendant's History and Characteristics

The defendant resides in Serbia.  He has no strong ties to this country and has every incentive to flee.  Accordingly, detention is also appropriate under 18 U.S.C. §§ 3142(f)((2)(A) (serious risk of flight).  See United States v. Rudolph, 582 F. Supp. 3d 804, 815-16 (D. Col. 2022)

(defendant's proposed conditions electronic monitoring and surrendering passport would not reasonably assure his appearance or the safety of the community because those conditions at best limit a fleeing defendant's head start).  Indeed, the courts have repeatedly held defendants without bond in similar circumstances.  See, e. g., United States v. Cordon, 2015 WL 50114466 (D.D.C.) (Kollar-Kotelly, J.) (holding defendant charged with narcotics offenses without bond when defendant had fought extradition from Guatemala, had no ties to the U.S., and had access to substantial amounts of money); United States v. Amar, 300 F. Supp. 2d 287 (D.D.C. 2018) (Kollar-Kotelly, J.) (holding dual citizen of Morocco and Israel charged with money laundering without bond); United States v. Kattar, 960 F.2d 144 (1st Cir. 1992) (affirming detention order of defendants charged with large scale drug trafficking who had significant ties overseas).

### D.     Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention. As noted above, based on the charges in the indictment, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense.  18 U.S.C. § 3142 (e)(3)(A).  Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." United States v. Strong, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." Strong, 775 F.2d at 507.  As noted by the D.C. Circuit:

The legislative history indicates that the rebuttable presumption covering serious drug

trafficking offenses was included because:

> Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses.  Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences.

United States v. Alatishe, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th

Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203).  Thus, in creating a

presumption of pretrial detention for serious drug trafficking offenses, both the legislative history

and the statutory language make clear that very "real-world" concerns lie behind the recognition

of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking

offenses.  Accordingly, this factor also weighs in favor of detention.

## Conclusion

The United States respectfully requests that the Court detain the defendant without bond

pending trial.

Respectfully submitted,
MATTHEW GRAVES,
UNITED STATES ATTORNEY


By:       /s/ Andy Wang
          Andy Wang
          D.C. Bar No. 1034325
          Assistant United States Attorney
          United States Attorney's Office for D.C.
          Patrick Henry Building
          601 D Street, N.W.,
          Washington, D.C. 20530
          E-mail: andy.wang@usdoj.gov

Telephone: (202) 870-4940